**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Marshall Spiegel, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 15 CV 1809 |
| v. | ) | |
| | ) | Honorable Joan B. Gottschall |
| EngageTel Inc., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marshall Spiegel ("Spiegel") brings this lawsuit[1] on behalf of himself and others

who have allegedly received unsolicited telephone calls from numerous defendants, including

EngageTel Inc. ("EngageTel") and its principal, Dennis Carlson ("Carlson") who has been

dismissed as a defendant), despite being on the national "Do Not Call" Registry.  Spiegel alleges

that the defendants took part in a scheme to flood residential phone lines with thousands of

"junk" calls containing fraudulent Caller ID information for purposes of scam marketing and to

collect so-called "dip fees" associated with the calls.  Pl.'s Resp. to Defs.' Stmt. of Undisputed

Material Facts ("SUMF") ¶ 23, ECF No. 178.  He brings claims under the Telephone Consumer

Protection Act ("TCPA"), 47 U.S.C. §§227 *et seq*.; under the Illinois Consumer Fraud and

Deceptive Business Practices Act ("ILCFA"), 815 ILCS 505/1 *et seq*; for unfair practices in

violation of the ILCFA; and for unjust enrichment.  Following the completion of discovery,

EngageTel has filed a motion for summary judgment, contending primarily that it did not

"make" or "initiate" the calls at issue and so cannot be held liable under the TCPA.

---

[1] Spiegel brought this suit as a potential class action, but he explicitly abandons class certification in his summary judgment briefing.  Resp. Mot. Summ. J. 16 n.7, ECF No. 177.

## I. Summary Judgment Standard and the Parties' Fact Statements

Summary judgment must be entered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In resolving summary judgment motions, "facts must be viewed in the light most favorable to," and all reasonable inferences from that evidence must be drawn in favor of the nonmoving party–but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary") (citation omitted)). After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 255 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor") (citations and quotations omitted)). Summary judgment is warranted when the nonmoving party cannot establish an essential element of his case on which he will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

Before reciting the facts, several issues raised by the parties' Local Rule 56.1 statements must be addressed. Local Rule 56.1 creates a procedure for presenting facts that a party contends are material at summary judgment. Specifically, Local Rule 56.1(a)(3) requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (quoting L.R. 56.1(a)(3)). Local Rule 56.1(b)(3)(B) requires the nonmoving party to submit a response to each statement of fact provided by the movant, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(C). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." *Id.* Similarly, "[i]f additional material facts are submitted by the opposing party. . .the moving party may submit a concise reply in the form prescribed in that section for a response." L.R. 56.1(a). If the movant fails to respond properly to the opposing party's statement of additional facts, those facts will be deemed admitted. *Id.*

Both parties make inappropriate arguments in their Local Rule 56.1(b)(3) responses. In Spiegel's response to EngageTel's fact statements, Spiegel repeatedly argues that certain of EngageTel's fact statements are not "relevant" and "material." *E.g.,* Pl.'s Resp. to Defs.' SUMF. ¶¶ 7, 9, 10–13, 20, 39. He also inappropriately argues what inferences should be drawn from the evidence. *E.g., id.* ¶¶ 15, 21, 40, 56, 60 ("¶ 15: to the extent that the proposed fact implies Akhavan made relevant calls alone."). And Spiegel summarizes and quotes the

deposition testimony and other evidence rather than simply citing it (he cites it, too). *E.g., id.* ¶¶ 24, 25, 29. EngageTel's response to paragraph 94 of Spiegel's statement of additional facts spans two pages and block quotes a deposition transcript. Defs.' Resp. to Pl.'s Stmt. of Add'l Fact, ECF No. 185 at 11–13; *see also id.* at 49, 50 ¶¶ 114, 115 (block quoting other depositions). Spiegel specifically asked the court to strike paragraphs 42 and 52 of EngageTel's Local Rule 56.1 statement as inappropriate argument. Pl.'s Resp. to Defs'. SUMF 14.

Consistent with its ordinary practice, this court will not consider improper arguments in the Local Rule 56.1 statements. *See, e.g., Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008); *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 359–60 (7th Cir. 2009). The court also disregards legal conclusions in the fact statements. *Minn. Life Ins. Co. v. Kagan*, 847 F. Supp. 2d 1088, 1093 (N.D. Ill. 2012); *Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771–72 (N.D. Ill. 2012). To the extent necessary, the court addresses relevance and materiality issues as they arise *infra*. *See Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1019 (N.D. Ill. 2018) (Gottschall, J.).

The parties also raise several evidentiary objections that need not be resolved because they do not concern alleged disputes that are material at summary judgment. *See id.* Spiegel raises a hearsay objection. Pl.'s Resp. to Defs.' SUMF ¶ 47. EngageTel separately asks the court to strike several paragraphs of Spiegel's statement of additional facts on relevance grounds (¶¶ 93, 98), hearsay grounds, and authentication grounds (*see* ¶¶ 85, 90, 98, 99, 102, 103, 104, 105, 106, 107, 117). To the extent necessary, the court makes relevance and materiality determinations *infra*.

Due to the numerous Local Rule 56.1 violations, the fact statements have become unwieldy and voluminous. For instance, defendants' response to paragraph 99 of Spiegel's statement of additional facts spans 18 pages. *Id.* at 17–35. Spiegel shares part of the blame for

the length of the response, however, because he used 16 lettered sub-paragraphs in ¶ 99 to skirt the 40-paragraph limit on his Local Rule 56.1(b)(3) statement of additional facts. Defendants are not immune to this method of ballooning the fact statements. *See* Defs.' SUMF ¶¶ 19, 35 (breaking fact into four and five sub-paragraphs), ECF No. 170. Indeed, paragraph 35 is broken into 12 sub-paragraphs labeled (a) through (l). Given the needs of this case, the court considers these to be examples of excessive use of sub-paragraphing in violation of Local Rule 56.1. *See Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 655–56 (7th Cir. 2011) ("[W]hat is 'short' to one judge may be long to another, and a single judge's definition might reasonably vary from case to case."); *Rivera*, 319 F. Supp. 3d at 1018.

The court nevertheless exercises its discretion not to strike the fact statements. EngageTel urges the court to strike ¶¶ 110–20 of Spiegel's fact statement for exceeding the 40-paragraph limit. Those paragraphs, as well as several others, describe other alleged complaints and investigations the court concludes are not necessary to its decision. *See* Fed. R. Evid. 404(b). The court therefore need not attempt to determine the proper remedy for either party's use of excessive sub-paragraphing because the court can simply focus on the material facts.

The purpose of Local Rule 56.1 is "to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). The fact statements here hardly further that purpose. Nevertheless, the material issues turn out to be relatively discrete, and so the court determines that the parties' best interests would be served by cutting through the thicket.

## II. Facts

Unless stated otherwise, the court sets forth the facts in the light most favorable to Spiegel, the nonmoving party. The court previously denied in part a motion for judgment on the pleadings filed by EngageTel and other defendants. *See Spiegel v. EngageTel*, No. 1:15-CV-5809, slip op. at 8–10 (N.D. Ill. Sept. 29, 2016), available at ECF No. 134. While many details have been added, the basic picture of the facts remains the same.

There is no dispute that Spiegel received unwanted phone calls. *See* Pl.'s Resp. to Defs.' SUMF ¶¶ 59–62, 66–75. During discovery, Spiegel identified 87 calls he received that he associates with EngageTel. *Id.* ¶ 59. Seven of the calls could not have come from the EngageTel-related phone numbers, however, and the date of an eighth call raises at least a factual dispute over whether it can be associated with EngageTel. *See id.* ¶¶ 59–60. Giving Spiegel the benefit of the doubt leaves approximately 81 calls.

The TCPA dispute here primarily concerns whether EngageTel's role subjects it to liability for those 81 calls. Understanding this dispute requires a close examination of the relationship among several people and companies involved.

Defendant Arash Akhavan ("Akhavan") (who has settled) used an automatic telephone dialing system (ATDS) to place the calls Spiegel received. Pl.'s Resp. to Defs.' SUMF ¶¶ 3, 10, 15, 79. An entity referred to as "Leads Direct" owned and operated the ATDS Akhavan used to call Spiegel. *Id.* ¶ 39. Akhavan made calls using Leads Direct ATDS before he began working with EngageTel. *Id.* ¶ 51.

As it was his practice to do, Akhavan obtained Spiegel's number from Leads Direct. *Id.* ¶¶ 39, 40. "Akhavan purchased telephone numbers—also known as 'leads'—from Leads Direct to make telemarketing calls." *Id.* ¶ 11 (citations omitted). He told Leads Direct what general geographic [area he wanted to target] and Leads Direct would give him a

list of "leads." *Id.* ¶ 12.

The calls to Spiegel were placed under the auspices of a telemarketing agreement between Akhavan and an energy broker referred to as "M-2." Pl.'s Resp. to Defs.' SUMF ¶ 15; *see also id.* ¶¶ 16–19 (listing energy companies M-2 represented and establishing that they provided energy services to Illinois customers).

The parties paint starkly different pictures of EngageTel's role. This much is undisputed: Akhavan signed a master services agreement (using an alias) with EngageTel on October 12, 2012, and January 7, 2013. Pl.'s Resp. to Defs.' SUMF ¶¶ 32, 33.

EngageTel describes its business as being "assigning virtual telephone numbers to its customers and collecting customer-specific do not call requests for its customers." Pl.'s Resp. to Defs.' SUMF ¶ 23 (citing Carlson Dep. 5:7–22).

According to Carlson, EngageTel's virtual phone numbers facilitated his telemarketing clients' efforts to maintain their do-not-call lists by giving the called parties a number they could call and ask to be removed from the telemarketer's list. *Id.* ¶¶ 24–25. The number displayed, which Spiegel claims is "spoofed" (the meaning of the term "spoof" is hotly disputed), is not the number from which the call actually originates. Defs.' Resp. to Pl.'s Stmt. of Add'l Fact ¶ 83. It is undisputed that EngageTel makes money from "dip" fees (i.e., the fraction of a cent generated when a customer uses one of its virtual phone numbers and another phone company looks up the Caller ID information). Pl.'s Resp. to Defs.' SUMF ¶¶ 30–31. EngageTel shares "dip fee" revenues with its customers, including Akhavan. *Id.* ¶ 37; Defs.' Resp. to Pl.'s Stmt. of Add'l Fact ¶ 84 ("We don't get paid specifically for do-not-call service, we provide it whether they like it or not.") (quoting Carlson Dep. 67:3-7).

Carlson testified that EngageTel's customers tell it what to input into a 15-character

field for Caller ID (also called the "CNAM" field). *Id.* ¶¶ 27–29. Thus, Carlson testified that EngageTel did no more than assign virtual phone numbers and, that EngageTel input whatever information Akhavan wanted into the CNAM field, and that EngageTel produced a daily list of callers who wanted to be removed from Akhavan's list of numbers to call. Defs.' SUMF ¶ 35. Regarding the telemarketing campaign at issue, "CNAM information used by Akhavan generally referenced energy, power, electric and/or customer service." Pl.'s Resp. to Defs.' SUMF ¶ 36 (disputed only as to whether content of CNAM fields was misleading).

EngageTel's role is genuinely disputed, and so the facts must be viewed in the light most favorable to Spiegel. Portions of Akhavan's testimony can be viewed favorably to Spiegel as confirming that the virtual phone numbers EngageTel provided were needed to place calls using the Leads Direct ATDS. *See* Defs.' Resp. to Pl.'s Stmt. of Add'l Fact ¶¶ 81–82.

Contrary to Carlson's characterization of EngageTel's business, Akhavan described the virtual numbers EngageTel supplied as a means of remaining "under the radar" of online complaints about telemarketing calls. Akhavan Dep. 23, 101-02; Defs.' Resp. to Pl.'s Stmt. of Add'l Fact ¶ 87 (disputed fact). Akhavan also averred that Carlson became involved in his "marketing process." Pl.'s Resp. to Defs.' SUMF ¶ 42. EngageTel cites Akhavan's arguably inconsistent testimony at his subsequent deposition. *See id.* However, "fodder for impeachment . . . is not alone enough to avoid summary judgment." *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 406 (7th Cir. 1998) (citing *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997) (holding inconsistent, unsworn statement which could be used only to impeach did not create genuine factual dispute); accord *Outlaw v. Newkirk*, 259 F.3d 833, 841 (7th Cir. 2001) (citations omitted).

Regardless, additional evidence viewed favorably to Spiegel shows that EngageTel took a more hands-on role in Akhavan's telemarketing efforts than Carlson testified. It is undisputed that Carlson has been to websites at which he can search for a telemarketer's phone number. Defs.' Resp. to Pl.'s Stmt. of Add'l Fact ¶ 90. A jury could reasonably infer from the other evidence in the record that he visited those sites to keep abreast of complaints on virtual phone numbers supplied by EngageTel.

Akhavan also testified that Carlson consulted with him about what to put in the CNAM field. Akhavan Dep. 78, 84. Drawing inferences favorable to Spiegel, Akhavan testified that Carlson suggested that he use phone numbers with area codes similar to the numbers being called to increase the chance that the call would be answered because the call appeared to be coming from the same geographic area as the called party. Defs.' Resp. to Pl.'s Stmt. of Add'l Fact ¶ 86 (citation omitted). Also, Carlson and Akhavan testified that Carlson once threatened to, and did, change the CNAM for virtual numbers assigned to Akhavan and that Carlson "supplied" CNAM information for his customers. Carlson Dep. 255:6-13; 256:2-4 (threatening to change Caller ID to "scammer"). Finally, Carlson sent notices that, when viewed favorably to Spiegel, warned clients not to call certain locations, such as Missouri, due to regulatory activity he considered unfavorable to telemarketers. *See* Carlson Dep. 264–65. Akhavan testified that his business was "better" as a result of Carlson's advice. Pl.'s Resp. to Defs.' SUMF ¶ 51. For instance, Carlson sent the following email: "Hi Arash/Chris, You may want to swap out numbers in the range of (312) 340-5541 to (312) 340-5556 as we are seeing a large amount of extremely negative blogging on them. I am working to get you some more numbers, but I would

recommend you remove these now, and replace with other numbers we have assigned."[2] Defs.' Resp. to Pl.'s Stmt. of Add'l Fact ¶ 88.

Spiegel testified that he purchased call-blocking equipment and that its value was diminished due to telemarketers' use of frequently changing Caller ID information. Pl.'s Resp. to Defs.' SUMF ¶ 72. He also testified that he spent $70 on older phones with call-blocking features. *Id.* ¶ 73; *but see id.* ¶¶ 73–76 (discussing limitations of equipment and Spiegel's aggravation with it).

## III. Telephone Consumer Protection Act Claim

When it enacted the TCPA, Congress made it unlawful for "any person within the United States, or any person outside the United States if the recipient is within the United States . . . to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(B) (subjecting rule to certain exceptions). The TCPA, with certain exceptions no one contends apply here, also prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA allows "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the

---

[2] Defendant claims that this evidence is not authenticated and then, subject to the objection, admits that Carlson sent the email. Defs.' Resp. to Pl.'s Stmt. of Add'l Fact ¶ 88. The objection is overruled because there appears to be no genuine dispute over the message's authenticity at summary judgment. This does not prejudice any party's ability to oppose the introduction of any exhibit into evidence at trial.

regulations" to bring a private lawsuit and recover actual or statutory damages. 47 U.S.C.

§ 227(c)(5).

The question here is whether a reasonable fact finder could conclude that EngageTel "makes" or "initiates" a call for TCPA purposes. EngageTel contends that the undisputed material facts establish that it neither "initiated" nor "made" the underlying calls. EngageTel moved for judgment on the pleadings on a similar theory, emphasizing the fact that Spiegel conceded in his complaint that EngageTel was not the phone carrier for the telemarketing calls he received. This court found the issue to be inappropriate for resolution without further factual development. *See Spiegel v. EngageTel*, No. 1:15-CV-5809, slip op. at 8–10 (N.D. Ill. Sept. 29, 2016). The court begins by determining whether the statute's plain language or a FCC ruling interpreting the TCPA furnishes the rule of decision.

## A. The FCC 2015 Ruling Applies

When briefing on the instant motion began, the parties disagreed about whether a 2015 declaratory ruling of the FCC*, In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (2015 Declaratory Ruling)*, 30 FCC Rcd. 7961 (2015), controls. In its 2015 ruling the FCC, among other things, "clarif[ied] who makes a call under the TCPA and is thus liable for any TCPA violations." *Id.* at 7978. The FCC identified several factors to guide a "totality of the circumstances" inquiry as follows:

> 29. The intent of Congress, when it established the TCPA in 1991, was to protect consumers from the nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate. Congress found that consumers consider these kinds of calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy; that businesses also complain that these kinds of calls are a nuisance, are an invasion of privacy, and interfere with interstate commerce; and that banning such calls, except when made for an emergency purpose or when the called party consents to receiving the call, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion. Congress therefore put the responsibility for compliance with the law directly on the party that "makes" or "initiates" automated and prerecorded message calls. As

the Commission recognized in the *DISH Declaratory Ruling*, neither the TCPA nor the Commission's rules define "make" or "initiate," nor do they establish specific factors to be considered in determining who makes or initiates a call, but noted that "initiate" suggests some "direct connection between a person or entity and the making of a call." In issuing the guidance that we provide today, we account for changes in calling technology that inure to the benefit of consumers while fulfilling the intent of Congress to prohibit nuisance calls that cause frustration and harm.

30. Specifically, a "direct connection between a person or entity and the making of a call" can include "tak[ing] the steps necessary to physically place a telephone call." It also can include being "so involved in the placing of a specific telephone call" as to be deemed to have initiated it. Thus, we look to the totality of the facts and circumstances surrounding the placing of a particular call to determine: 1) who took the steps necessary to physically place the call; and 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purposes of the TCPA. In discussing below how these standards apply in the context of factual circumstances presented in petitions before us, we identify factors that are relevant to the *DISH Declaratory Ruling* analysis. Depending upon the facts of each situation, these and other factors, such as the extent to which a person willfully enables fraudulent spoofing of telephone numbers or assists telemarketers in blocking Caller ID, by offering either functionality to clients, can be relevant in determining liability for TCPA violations. Similarly, whether a person who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes may also be a factor in determining whether the platform provider is so involved in placing the calls as to be deemed to have initiated them.

*Id.* at 7979–81 (footnotes and internal quotations omitted). Spiegel contends that the court must look to the factors identified in the 2015 declaratory ruling to determine whether EngageTel placed or initiated the calls at issue here. The court agrees.

When EngageTel filed its motion for summary judgment, it contended that the court should disregard the FCC's 2015 declaratory ruling and determine the rule of decision by looking to the TCPA's plain language. Mem. Supp. Mot. Summ. J. 2–3 & n.1, ECF No. 169. EngageTel acknowledged that a challenge to the FCC ruling was then pending before the D.C. Circuit and stated the pending case would be outcome determinative here if the D.C. Circuit were to accept the argument that the ruling was "at odds with the plain language of the TCPA, the original intent of Congress, and common sense." *Id.* at 2 & n.1. The D.C. Circuit

subsequently denied in relevant part petitions for review of portions of the FCC ruling, though the petitioners do not appear to have explicitly challenged the portions of the 2015 declaratory ruling clarifying who makes or initiates calls.[3]  *See ACA Int'l v. FCC*, 885 F.3d 687, 691–92 (D.C. Cir. 2018) (summarizing four issues on which review was sought; granting petition for review in part and denying it in part).  EngageTel offers no reason to distinguish *ACA International* in its reply and confines its argument to the factors listed in the FCC's 2015 ruling. *See* Defs.' Reply Supp. Mot. Summ. J. 1–5.

Regardless of whether the D.C. Circuit considered the validity of the particular FCC rule here, the Administrative Orders Review Act, which is commonly called the Hobbs Act, bars the defendants from challenging the rule's validity before the court.  The Hobbs Act provides:

> The court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of . . . all final orders of the Federal Communications Commission made reviewable by 47 U.S.C. § 402(a).

28 U.S.C. § 2342(1); 47 U.S.C. § 402(a); *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 468 (1984).  The Seventh Circuit applied the Hobbs Act to a challenge to a TCPA provision in *CE Design, Ltd. v. Prism Business Media, Inc.*, 606 F.3d 443, 446–51 (7th Cir. 2010).  The defendant there urged the district court "to ignore the FCC orders" establishing a defense to TCPA liability "because, according to it, Congress did not authorize the FCC to establish an EBR defense."  *Id.* at 445.  The Seventh Circuit held that the Hobbs Act precluded the defendant's challenge to the validity of the FCC rule, explaining the fact that the "challenge to the FCC's [interpretation of the TCPA] arises in a dispute between private parties makes no

---

[3] In *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 883 F.3d 459, 465 (4th Cir. 2018), the Fourth Circuit held that "[w]hen Chevron meets Hobbs, consideration of the merits must yield to jurisdictional constraints." The Supreme Court has granted certiorari on the Hobbs Act question presented in *Carlton*.  No. 17-1705, 139 S. Ct. 478 (cert granted. Nov. 13, 2018; oral argument held Mar. 25, 2019).

difference—the Hobbs Act's jurisdictional limitations are 'equally applicable whether [a party] wants to challenge the rule directly . . . or indirectly, by suing someone who can be expected to set up the rule as a defense in the suit.'" *Id.* at 448 (quoting *City of Peoria v. Gen. Elec. Cablevision Corp.*, 690 F.2d 116, 120 (7th Cir. 1982)) (other citations omitted). Under *CE Design*'s holding, the Hobbs Act prevents this court from entertaining EngageTel's argument that the FCC ruling at issue "conflicts with the TCPA's plain language." *Id.* at 447 (characterizing and rejecting argument). Now that the D.C. Circuit has upheld the FCC ruling, this court "is bound to follow" it.[4] *Blow v. Bijora, Inc.*, 855 F.3d 793, 802 (7th Cir. 2017) (citing *CE Design*, 606 F.3d at 448–50 and *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1308 (11th Cir. 2015)); *accord Physicians Healthsource, Inc. v. A-S Medication Sols. LLC*, 324 F. Supp. 3d 973, 977 (N.D. Ill. 2018); *see also Blow*, 855 F.3d at 802–03 (noting that *ACA Int'l* was then pending before the D.C. Circuit and resolving the case on a different ground).

**B. Analysis**

Though the parties apparently agree that this court must apply the FCC ruling, EngageTel suggests in its reply that the court should not consider some of the factors listed in the FCC ruling. Defs.' Reply Supp. Mot. Summ. J. 5, ECF No. 186. Without citing authority, EngageTel asserts that factors the FCC "enumerated but did not discuss at any length in its ruling" need not be considered. *Id.* EngageTel reads the 2015 declaratory ruling as creating a bright line, requiring a defendant to control four factors before TCPA liability attaches: "whether a call was made, when a call was made, the call recipient, and the content of the call once connected." Defs.' Reply Supp. Mot. Summ. J. 5. Elsewhere in its briefing EngageTel contends that some factors identified by the FCC are elements that must be proven to impose liability. *See, e.g.,*

---

[4] *But see Ira Holtzman, CPA & Assocs. Ltd. v. Turza*, 728 F.3d 682, 688 (7th Cir. 2013) (stating that the Hobbs Act does not require deference to what amounts to "a freestanding declaration [of the FCC] untied to an adopted text"). EngageTel does not contend that this exception applies.

Mem. Supp. Mot. Summ. J. 7 ("The FCC Ruling not only required plaintiff to prove EngageTel enabled Akhavan to 'spoof' others' telephone numbers . . . it also required plaintiff to prove EngageTel enabled Akhavan to spoof telephone numbers fraudulently.") (internal citation omitted).

EngageTel's efforts to read bright line elements into the 2015 declaratory ruling proves unavailing. The ruling itself makes clear that some factors will be relevant "[d]epending upon the facts of each situation." 2015 Declaratory Ruling at 7980. That the FCC discussed some factors more than others in its analysis indicates that what factors are most relevant depends on the facts and circumstances of the case. *See, e.g.*, *United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars*, 403 F.3d 448, 467 (7th Cir. 2005) (discussing extensively "the most important factors" when performing totality of circumstances analysis); *see also Nunes v. Twitter, Inc.*, 194 F. Supp. 3d 959, 963–64 (N.D. Cal. 2016) (emphasizing fact-specific inquiry required by the 2015 declaratory ruling).

EngageTel's four factor test—based on who controlled whether a call was made, when it was made, who was called, and the call's contents—is also a poor fit for phone calls to residential customers and cell phones. EngageTel derives its control test from the FCC's analyses of whether certain services that send text messages make or initiate calls within the meaning of the TCPA. *See* 2015 Declaratory Ruling ¶¶ 31–37; *see also generally Warciak v. Nikil, Inc.*, 2017 WL 1093162, at *3 (N.D. Ill. Mar. 23, 2017) (collecting cases applying the 2015 declaratory ruling to the sending of text messages). To show that it lacked requisite control, EngageTel relies on the undisputed fact that M-2 supplied the scripts for Akhavan's telemarketing calls. Pl.'s Resp. to Defs.' SUMF ¶ 21. Asking whether the user or the provider determines the contents of a text message makes sense when deciding who initiates the message because a text message must be composed before it is sent. *See id.* ¶¶ 36–37. Even in text

messaging cases, who controls the content of the message is not dispositive, however. *Serban v. CarGurus, Inc.*, 2018 WL 1293226, at *4 (N.D. Ill. Mar. 12, 2018) (citing 2015 Declaratory Rule ¶ 37). It is even less dispositive here. The fact that EngageTel did not script what happened on the telemarketing calls placed by Akhavan has less significance here because a ringing phone can be intrusive regardless of the message delivered after the called party answers. *See Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637 (7th Cir. 2012); *CE Design*, 606 F.3d at 450.

Considering the totality of the facts and circumstances, multiple genuine factual disputes preclude summary judgment for EngageTel. When analyzing the totality of the circumstances at summary judgment, the court, like the jury, may not consider each fact in isolation. *See Hall v. City of Chicago*, 713 F.3d 325, 331–32 (7th Cir. 2013); *Payne v. Pauley*, 337 F.3d 767, 776–78 (7th Cir. 2003). For this reason, tests based on the totality of the factual circumstances generally do not lend themselves to summary judgment where genuine disputes exist. *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010); *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005); *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 940–43 (7th Cir.1988); *but see Alexander v. Erie Ins. Exchange*, 982 F.2d 1153, 1160 (7th Cir. 1993) (summary judgment appropriate under a totality of the circumstances test where no reasonable jury could find for the plaintiff).

Here, genuine disputes exist over facts material to whether EngageTel's "actions and choices effectively program [the Leads Direct ATDS] to such an extent that [EngageTel] is so involved in the making of the call as to be deemed the initiator of the call." 2015 Declaratory Ruling ¶ 37; *see also Soppet*, 679 F.3d at 642 (discussing FCC ruling recognizing third-party liability under the TCPA: "that calls placed by a third-party collector on behalf of a creditor are treated as having been made by the creditor"). While the record contains little about how the Leads Direct ATDS worked, a reasonable jury could find from Akhavan's testimony that he

needed to input into the Leads Direct system the virtual phone numbers supplied by EngageTel to place telemarketing calls.[5]  *See* Akhavan Dep. 53–55.  Without the virtual numbers, the consumers had no callback numbers for opting out.  *See id*.  Defendants counter that Akhavan used the Leads Direct ATDS to make telemarketing calls before he hired EngageTel and that it is undisputed that he physically programmed the ATDS.  *See* Pl.'s Resp. to Defs.' SUMF ¶ 51; Defs.' Reply Supp. Mot. Summ. J 2–3.  Neither party cites any evidence shedding light on how Akhavan placed his pre-EngageTel calls, however, so given the need to maintain a "do not call" list, it would be reasonable to infer that he obtained the necessary virtual phone numbers from another source.  *See id.*

Considerable additional evidence supports[6] a finding that EngageTel effectively programmed the Leads Direct ATDS Akhavan used.  In its 2015 ruling, the FCC found that a customer who "effectively programs" a cloud-based ATD can be deemed the initiator of the call rather than the company that hosts the ATDS.  2015 Declaratory Rule ¶ 37.  In addition to supplying the virtual phone numbers Akhavan used, there is evidence from which a reasonable jury could find that EngageTel exerted considerable control over which virtual numbers Akhavan used when he placed specific calls.  The court must accept at summary judgment Akhavan's characterization of Carlson as being part of his "marketing process."  Akhavan Decl. ¶ 2, Ex. 5, ECF No. 170; *but see* Pl.'s Resp. to Defs.' SUMF ¶ 42.

---

[5] Defendants argue that Akhavan's testimony cited in ¶ 81 of his Local Rule 56.1(b)(3) statement of additional facts is speculative.  Defs.' Reply Supp. Mot. Summ. J. 1–3 (citing *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014)).  The court need not determine whether Akhavan's testimony on pages 86–87 of his deposition transcript is speculative because defendants do not discuss Akhavan's citation to pages 53–54 of his disposition. *See* Resp. to Pl.'s Stmt. of Add'l Facts ¶ 81; *see also* Pl.'s Resp. to Defs.' SUMF ¶¶ 8, 29 (same citation to create a genuine dispute).

[6] The court neither considers nor decides today whether the provision of a virtual phone number to a telemarketer, standing alone, gives rise to TCPA liability.

Consistent with Akhavan's characterization, the jury could find that Carlson suggested matching the area codes of the number being called and the number from which the telemarketing appeared to originate. Defs.' Resp. to Pl.'s Stmt. of Add'l Fact ¶ 86. The jury could also find that Carlson kept abreast of online complaints about virtual numbers he issued to Akhavan and his other telemarketing clients. *Id.* ¶ 90. Carlson warned them about complaints and regulatory activity, including cautioning his clients not to call a certain state. *See* **Carlson Dep. 264–265.** Indeed, Carlson warned Akhavan at least once to cease using specific numbers and stated that he was proactively working (there is no evidence of a request) to "get you different numbers." Defs.' Resp. to Pl.'s Stmt. of Add'l Fact ¶ 88. This creates a genuine fact dispute over the degree of EngageTel's involvement in guiding who Akhavan was calling and from what numbers the calls appeared to come. *See* Pl.'s Resp. to Defs.' SUMF ¶ 12. Given Carlson's suggestion to match area codes and his proactive efforts to supply new numbers in a particular area code (312), a reasonable jury could find that he was aware of the area code being called and working to program the Leads Direct ATDS to place new calls to that area code.

The jury could also find that EngageTel used its control over the virtual phone numbers to affect Akhavan's calling behavior and the likelihood that his calls would be answered. Although Akhavan was nominally responsible for choosing what appeared in the Caller ID CNAM field, Carlson consulted with him about what to include in that field. Akhavan Dep. 78, 84. And Carlson disciplined Akhavan by changing the CNAM information associated with his virtual numbers; the altered text included undesirable words such as "scammer." Carlson Dep. 255:6-13; 256:2-4.

Taken cumulatively and in the light most favorable to Spiegel, this evidence is sufficient to create a genuine fact dispute over whether EngageTel is "so involved in the

placing of a specific telephone call" as to be deemed to have initiated it.  2015 Declaratory Ruling ¶ 30 (citation omitted).  As interpreted by the FCC, the TCPA imposes liability where a party "giv[es] the third party specific and comprehensive instructions as to timing and the manner of the call" *Id.*  Substantial fact questions surrounding the comprehensiveness and specificity with which EngageTel exerted control over Akhavan's calling exist here.  EngageTel's motion for summary judgment on Spiegel's TCPA claim must therefore be denied.

The parties' remaining TCPA arguments concern factors identified in the 2015 declaratory ruling such as "whether a person who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes," "the extent to which a person willfully enables fraudulent spoofing of telephone numbers," and whether EngageTel "assists telemarketers in blocking Caller ID, by offering either functionality to clients."  ¶ 30 (citations and footnotes omitted).  These factors were not applied by the FCC, and this court sees no need to construe these factors extensively when the record is sufficient to reach a jury on grounds the FCC explicitly considered.[7]  *See id.* ¶¶ 31–37.  Not reaching these factors also permits the court to resolve the present motion

---

[7] The court notes that the Ninth Circuit recently affirmed the denial of summary judgment to a TCPA plaintiff suing debt collectors who placed calls to collect student loan debts.  *Henderson v. United Student Aid Funds, Inc.*, No. 17-55373, --- F.3d ---, 2019 WL 1302915 (9th Cir. Mar. 22, 2019).  Among other things, the *Henderson* court concluded that even if the student loan company could not be charged with actual knowledge "that the debt collectors were violating the TCPA, [the student loan company] at a minimum 'had knowledge of facts that would have led a reasonable person to investigate further.'"  *Id.* at *6 (quoting Restatement (Third) of Agency § 4.06 cmt. d).  There is ample evidence in the record that EngageTel was aware of complaints against the abusive practices of the telemarketers using its services.  *See, e.g.*, Resp. to Pl.'s Stmt. of Add'l Facts ¶¶ 92, 93.  Citing a decision of a district court in the Ninth Circuit, *Kauffman v. CallFire, Inc.*, 141 F. Supp. 3d 1044, 1049 (S.D. Cal. 2015), EngageTel says that notice of alleged violations does not equate to notice that a violation has occurred.  *See id.*  The parties have not briefed *Henderson*, but EngageTel's analysis of this issue creates substantial tension with the nonbinding decision in *Henderson*.  As in *Henderson*, even if EngageTel did not have knowledge of TCPA violations by its clients, the complaints, and also the evidence of what could be reasonably seen as Carlson's efforts to change virtual numbers when online complaints about abusive practices associated with a virtual number began to mount, raise a genuine question about whether EngageTel had a duty to investigate.

without striking the parties' Local Rule 56.1 statements. The parties of course remain free to argue the relevance of these factors and the evidence at trial.

### IV. Illinois Consumer Fraud and Deceptive Trade Practices Act Claims

EngageTel also moves for summary judgment on Spiegel's ILCFA claims. As this court explained when EngageTel moved for judgment on the pleadings, the Illinois Consumer Fraud and Deceptive Business Practices Act (ILCFA), 815 ILCS 505/1 *et seq.*, is "a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). Section 505/2 of the act, governing "unlawful practices," provides as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILCS 505/2. To prevail in a private action under the ILCFA, Spiegel must prove that: "(1) the defendant undertook a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of trade and commerce; (4) actual damage to the plaintiff occurred; and (5) the damage complained of was proximately caused by the deception." *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1000 (7th Cir. 2018) (quoting *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005)).

EngageTel first argues that Spiegel has come forward with no admissible evidence sufficient to allow a jury to find that it, rather than Akhavan, engaged in any of the deceptive practices about which Spiegel complains. Mem. Supp. Mot. Summ. J. 9–10. Spiegel bypasses this argument in his response, ECF No. 178 at 13, moving directly to the three factors Illinois courts consider when determining whether a practice is deceptive in violation of the ILCFA. Illinois courts consider: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers." *Robinson*, 775 N.E.2d at 961 (quoting *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)). The court discussed those factors at length at the pleading stage, and except as discussed below EngageTel does not dispute the court's analysis. *See Spiegel v. EngageTel*, No. 1:15-CV-5809, slip op. at 11–13 (N.D. Ill. Sept. 29, 2016).

## A. Control and Causation

Reprising its TCPA arguments, EngageTel contends that it exercised no control over Akhavan's calling practices or the contents of the CNAM field used by Akhavan. *See* Mem. Supp. Mot. Summ. J. 9–10.

EngageTel is correct about the CNAM field. It is undisputed that "EngageTel did not know on behalf of what entities Akhavan made telemarketing calls to consumers, did not know the telephone numbers of the consumers to whom Akhavan made telemarketing calls, and had no basis to question the text Akhavan assigned to each telephone number's CNAM field." Pl.'s Resp. to Defs.' SUMF ¶ 42. Spiegel points to Carlson's changing of the CNAM to include the word "scammer" to dispute this fact in part, but he does not allege or argue that this was done to defraud consumers rather than to settle a dispute with Akhavan. *See id.* ¶ 29. Nor does Spiegel contend that he was misled by seeing the word "scammer" in a Caller ID record. Thus, to the extent Spiegel's ILCFA claims are based on the contents of CNAM fields, he has not come

forward with evidence creating a genuine dispute over whether EngageTel, rather than Akhavan, proximately caused his damages. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 862 (Ill. 2005); *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 155 (Ill. 2002) (plaintiff did not see allegedly deceptive advertising and did not allege that advertisements induced him to buy defective product); *Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853, 861 (Ill. 1998). For the reasons discussed in the analysis of Spiegel's TCPA claim, however, genuine factual disputes preclude summary judgment on EngageTel's ILCFA claims premised on concealing the true originating phone number of telemarketing calls and frequently changing the virtual numbers used.

### B. Intent

EngageTel also maintains that Spiegel cannot produce sufficient evidence to allow a jury to find that EngageTel had a culpable state of mind. The ILCFA "eliminated the common law fraud requirement of scienter, and it is not necessary to prove actual reliance on the deception." *Thacker v. Menard, Inc.*, 105 F.3d 382, 386 (7th Cir. 1997). Rather, Spiegel need only come forward with sufficient evidence for a jury to find "that the defendant committed a deceptive or unfair act and intended that the plaintiff rely on that act." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012) (explaining that the ILCFA does not require proof of "intent to deceive").

Spiegel has carried his summary judgment burden, however. EngageTel points to evidence tending to show that it did not intend to defraud callers but rather to manage a "do not call" list and that Akhavan intended to induce the called party to answer the phone so his telemarketers could sell legitimate energy services. *See* Pl.'s Resp. to Defs.' SUMF ¶¶ 12, 23–31, 38, 43, 50. But a reasonable jury could find, for example from the evidence that Carlson proactively switched virtual phone numbers used by Akhavan, that EngageTel intended callers to

rely on the geographic associations implicit in the virtual phone numbers' area codes.[8] *See* Defs.' Resp. to Pl.'s Stmt. of Add'l Fact ¶¶ 86, 88, 90.

## C. Damages

Next, EngageTel asserts that Spiegel lacks sufficient evidence of actual damages. *Camasta v. Jos. A. Bank Clothiers, Inc*, 761 F.3d 732, 739 (7th Cir. 2014); *see also Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 908-09 (N.D. Ill. 2012) (damages are an element of an ILCFA claim). Actual damages are those that arise from "purely economic injuries." *Thrasher-Lyon*, 861 F. Supp. 2d at 912 (internal quotations omitted). Damages for emotional distress, aggravation, invasion of privacy, and other forms of mental anguish are recoverable under the ILCFA only when coupled with actual economic damages. *Nelson v. Ashford Univ., LLC*, No. 16-cv-3491, 2016 WL 4530325, at *3 (N.D. Ill., Aug. 29, 2016).

When considering the sufficiency of Spiegel's second amended complaint, this court held that his allegations that he suffered "'significant and ongoing stress, annoyance, and emotional distress,' as well as actual damages due to aggravation and inconvenience, the cost of a call-blocking device or devices, and the diminished value of his call-blocking device(s) caused by the ability of the Defendants to circumvent this device" stated a claim for actual damages. *See Spiegel v. EngageTel*, No. 1:15-CV-5809, slip op. at 15 (N.D. Ill. Sept. 29, 2016). And "Spiegel's actual, economic damages are those that resulted in monetary costs to him as a result of the unwanted phone calls. The diminished value of the device is harder to quantify." *Id.*

EngageTel does not argue that the court should reconsider its analysis of the legal rules governing ILCFA damages. EngageTel submits, however, that Spiegel's damages are

---

[8] EngageTel points out in its reply that it received dip fees regardless of whether the call was answered. The court fails to see how this fact is material to EngageTel's intent or another element of Spiegel's ILCFA claim, and EngageTel does not explain. *See id.*

"speculative as a matter of law." Mem. Supp. Mot Summ. J. 11–12. The only case defendants cite has nothing to do with ILCFA damages. *See Haslund v. Simon Prop. Grp., Inc.*, 378 F.3d 653, 658 (7th Cir. 2004). The case was a diversity suit for breach of contract governed by Illinois law. *Id.* at 654. The court there applied contract damages principles to hold that the plaintiff did not come forward with sufficient evidence of "the value of the plaintiff's expected equity interest in a technology startup." *See id.* at 658. Needless to say, this case does not involve valuing a stake in a startup company.

Though EngageTel cites no ILCFA damages case, an ILCFA "plaintiff need not prove the amount of damages to an absolute certainty; however, . . . evidence must include a basis for computing damages with a fair degree of probability." *Petty v. Chrysler Corp.*, 799 N.E.2d 432, 439 (Ill. App. Ct. 1st Dist. 2003) (citing *City of Chicago v. Mich. Beach Hous. Coop.*, 696 N.E.2d 804, 809 (1998)). "[D]amages may not be predicated on 'mere speculation, hypothesis, conjecture or whim.'" *Id.* (quoting *Mich. Beach Hous. Coop.*, 696 N.E.2d at 809 (alterations in original)).

Spiegel has produced enough evidence of actual damages to withstand summary judgment. EngageTel cites no case interpreting the ILCFA to require expert testimony to support an award of actual damages. Actual damages under the ILCFA include the diminished value of goods such as telephone equipment. *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584 (Ill. 1996); *White v. DaimlerChrysler Corp.*, 856 N.E.2d 542, 548–19 (Ill. App. Ct. 1st Dist. 2006) (collecting authority). For the most part, EngageTel makes arguments that go to the weight of Spiegel's damages evidence. For instance, EngageTel attacks Spiegel's testimony to the extent that it is ambiguous about whether the value of his call-blocking

equipment was diminished by $5 per call or in total.[9]  *See* Pl.'s Resp. to Defs.' SUMF ¶ 71.  At summary judgment, Spiegel must receive the benefit of a favorable inference to the degree his testimony is ambiguous.

Consequently, his estimate of $5 per call multiplied by the 81 calls he received, *see id.* ¶¶ 59–62, supports a finding of $405 in actual damages.  EngageTel also questions the resale value of Spiegel's older phone equipment, claiming without citing authority that Spiegel must prove that there is a market for it.  Spiegel spent $70 for the phone equipment.  Pl.'s Resp. to Defs.' SUMF ¶ 72.  As there is evidence from which the jury could award actual damages, fact questions concerning the amount of those damages raised by EngageTel "belong[ ] to the jury."  *Barrett v. Brian Bemis Auto World*, 408 F. Supp. 2d 539, 546 (N.D. Ill. 2005) (denying summary judgment on ILCFA claim).

## V. Unjust Enrichment Claim Withdrawn

Finally, EngageTel moves for summary judgment on Spiegel's unjust enrichment claim. EngageTel argues that Spiegel can come forward with no evidence that he subscribed to a Caller ID service, and so EngageTel, through its alleged chicanery, obtained a portion of his funds in dip fees.  The court denied EngageTel's motion for judgment on the pleadings on this theory:

> [W]hen a claim of unjust enrichment arises out of the same conduct alleged in another claim, the unjust enrichment claim stands or falls with the other claim. *Cleary v. Phillip Morris Inc.,* 656 F.3d 511, 517 (7th Cir. 2011) (citing *Ass'n Benefit Servs. v. Caremark Rx, Inc.,* 493 F.3d 841, 855 (7th Cir. 2007)).

---

[9] Even if the claim were for $5 in diminished value and Spiegel had no evidence of other damages (he does), EngageTel does not argue that the $5 in actual damages is *de minimis*. *See* Spiegel, slip op. at 13 (stating that "[t]he doctrine of *de minimis non curat lex* ('the law doesn't concern itself with trifles') establishes a bar to recovery when the damages alleged are tiny and trifling). *See, e.g., Brandt v. Bd. of Educ. of City of Chi.,* 480 F.3d 460, 465 (7th Cir. 2007) (other citations omitted).

Spiegel, slip op. at 17.  Regardless of how this principle applies at summary judgment,

Spiegel withdraws his unjust enrichment claim in his summary judgment response, and

so the court dismisses it.  ECF No. 177 at 16 & n.7.

## VI. Conclusion

For the reasons stated, EngageTel's motion for summary judgment is granted in part and

denied in part.  Spiegel's ILCFA claim is dismissed to the extent it is predicated on his viewing

of Caller ID name information.  Spiegel's request for unjust enrichment damages is dismissed as

withdrawn.


Dated:  March 29, 2019                    ENTER ORDER:

                                          _____/s/_____
                                          Joan B. Gottschall
                                          United States District Judge